<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DEYRAHEL IMOORE, | : | Civil Action No. 12-2605 (RBK) |
| | : | |
| Plaintiff, | : | |
| | : | **<u>MEMORANDUM OPINION</u>** |
| v. | : | **<u>AND ORDER</u>** |
| | : | |
| WILLIAM GASBARRO at el., | : | |
| | : | |
| Defendants. | : | |

This matter comes before the Court upon Plaintiff's submission of three documents, one being titled "Affidavit of Fact / In the Nature of a Complaint [A]batement Notice [o]f Quo Warranto," <u>see</u> Docket Entry No. 1 at 2, another being titled "Writ of Discovery," <u>see</u> <u>id.</u> at 12, third one being titled "Affidavit of Fact Order to Abate in the Nature of Mandatory Injunction," <u>see</u> Docket Entry No. 2, and numerous other documents attached by Plaintiff to the aforesaid three submissions as exhibits, <u>see</u>, <u>generally</u>, Docket Entries Nos. 1 and 2, and it appearing that:

1.  All Plaintiff's submissions are executed in the style and utilized the argot common to legal submissions made by persons who qualify themselves as "Moorish," "Marrakush," "Murakush" or akin, which terms are often used to indicate "redempotionist" and/or "sovereign citizen" socio-political position.  <u>See</u> <u>Bey v. Stumpf</u>, 2011 U.S. Dist. LEXIS 120076, at *2-13 (D.N.J. Oct. 17, 2011) (detailing various aspects of said position).

    > Moorish and Redemptionist Movements.  Two concepts, which may or may not operate as interrelated, color the issues at hand. One of these concepts underlies ethnic/religious identification movement of certain groups of individuals who refer to themselves as "Moors," while the other concept provides the basis for another movement of certain groups of individuals, which frequently produces

these individuals' denouncement of United States citizenship, self-declaration of other, imaginary "citizenship" and accompanying self-declaration of equally imaginary "diplomatic immunity."

[a].    Moorish Movement

In 1998, the United States Court of Appeals for the Seventh Circuit - being one of the first courts to detail the concept of Moorish movement, observed as follows:

> [The Moorish Science Temple of America is a] black Islamic sect . . . . [T]hree-fourths of its temples (congregations) are inside prisons.  The Moors, as adherents to the Moorish Science Temple are called, have their own version of the Koran and a list of prophets that includes, in addition to the prophets recognized by orthodox Islam, Buddha, Confucius, and the founder . . . of the Moorish Science Temple . . . .  Two groups vie for leadership of the sect: one in Mt. Clemens, Michigan, headed by [someone referred to as] Grand Sheik/Moderator Brother R. Love-El, and one in St. Louis headed by [someone referred to as] Grand Sheik Jerry Lewis-Bey. (The suffixes "El" and "Bey" refer to the African tribes from which the Moors believe black people are descended.)

Johnson-Bey v. Lane, 863 F.2d 1308, 1309 (7th Cir. 1998).[1]

[b].    "Redemptionism," "Paper Terrorism" and Related Concepts

Shortly after the concept of Moorish movement was outlined by the Seventh Circuit, discussions of another movement appeared on the pages of legal opinions issued by the federal judiciary; that other movement was dubbed as "sovereign citizenship" movement. This movement was fostered by

> a loosely organized collection of groups and individuals who have adopted a right-wing anarchist ideology originating in the theories of a group called the Posse Comitatus in the 1970s.  Its adherents believe that virtually all existing government in the United States is illegitimate . . . . [Therefore, such] "sovereign citizens" wage war against the government and other forms of authority using "paper terrorism" harassment and intimidation tactics, and occasionally resorting to [physical] violence.

_____

[1]  The underlying term "Moors" seemingly reflects the adherents' interest in highlighting their actual or alleged "ancestry in ancient Moors, i.e., the seventeenth century Muslims of the Islamic Iberian Peninsula and North Africa, who were of Berber and Arab descent."  Marrakush Soc'y v. N.J. State Police, 2009 U.S. Dist. LEXIS 68057, at *4, n.1 (D.N.J. July 30, 2009).

Sovereign Citizen Movement, Anti-Defamation League, at
<<http://www.adl.org/Learn/ext_us/SCM.asp?LEARN_Cat=Extremism&
LEARN_SubC at=Extremism_in_America&xpicked=4&ite m=sov>>
(visited on Mar. 31, 2011).[2]   Consequently, a decade after the Seventh
Circuit's issuance of Bey v. Lane, the United States Court of Appeals for
the Third Circuit noted a stream of government actions aimed at
controlling the "paper terrorism" activities of sovereign citizens, which -
by then - matured into a wide-spread criminal scheme, where the scheme
participants' "self-legitimized" their names for the purposes of initiating
fraudulent legal transactions.   The Court of Appeals explained:

> Evidently, [adherents of this scheme have been] filing [fraudulent]
> financing statements under Article 9 of the UCC, which sets forth a
> process for perfecting security interests in property.   These liens
> and judgments, accessible on financing statement forms, are easy

---

[2]   The concept of "sovereign citizenship" does, occasionally, relate to the phenomenon of
"world passports."   "World passports," issued by the so-called World Service Authority
("WSA"), are not recognized, in the United States and in the majority of world nations, as
substitutes to official documents, such as national passports or drivers' licenses.   See, e.g.,
Eugenio J. Huot Calderon, The Concept of Puerto Rican Citizenship, 35 Rev. D.P. 321, 333-36
(1996); <<http://web.archive.org/web/20080307015819/http://foia.state.gov/masterdocs/07fam/
07m1310.pdf>>.   A former-World-War-II-bomber-pilot-turned-peace-activist Garry Davis
created the WSA in 1953 after renouncing his U.S. citizenship and gaining notoriety by picketing
the United Nations to argue that world peace requires a global government rather than a system
of nation-states.   See Daniel Engber, What's a World Passport? Slate Mag. (Mar. 24, 2006).   The
WSA has been promoting "world citizenship" by issuing documents largely similar in their
appearance to regular national passports, which the WSA called "world passports," to any person
who wanted to declare himself/herself "a citizen of the world." One can inexpensively obtain
such "passport" by filling out an application form at the WSA website.   See <<http://www.world
government.org/>>.   Therefore, while some persons just denounce their United States citizenship
under the claim of sovereign citizenship, see, e.g., Roche v. Attorney General, 420 Fed. App'x
124, 2011 U.S. App. LEXIS 5773, at 1-2, nn. 1 and 2 (3d Cir. 2011), others accompany their
denouncements of United States citizenship by applications for "world passports" and attempts to
use these passports as legally cognizable documents, sometimes for the purposes of perpetrating
criminal schemes in the United States.   See, e.g., Asghar v. State, 698 N.E.2d 879 (Ind. Ct. App.
1998).   Moreover, a person's denouncement of his/her United States citizenship (being
occasionally accompanied by the person's obtaining of a "world passport") frequently produces a
peculiar "side effect" in the form of that person's self-grant of alternative, imaginary citizenship
which, in turn, results in that person's insistence upon his/her "diplomatic immunity" for the
purposes of United States law or, better say, for the purposes of the "grantee's" attempts to avoid
the reach of law.   See, e.g., U.S. Dist. Court v. Ephriam, 2009 U.S. Dist. LEXIS 103284 (D. Kan.
Nov. 4, 2009).

to file. Once registered, however, the fraudulent liens are very
burdensome to remove. For example, in a New Jersey incident,
[one group] registered a fraudulent $ 14.5 million lien with the
New Jersey Department of Revenue against a federal prosecutor
and a $ 3.5 million lien against a federal judge for using [the group
participants'] "copyrighted" names in court papers and hearings . . .
. [Adherents of this scheme] have filed these commercial liens
with state departments of revenue, departments of state, or other
the state agencies responsible for receiving and recording these
financial instruments. Further investigation revealed that various
publications were advocating the exploitation of the UCC filing
process and provided explicit instructions on how to perfect these
fraudulent security interests, including sample financing statements
forms.  [These publications built on] the "Redemptionist" theory,
which propounds that a person has a split personality: a real person
and a fictional person called the "strawman."  . . .  Redemptionists
claim that government has power only over the strawman and not
over the live person, who remains free [and, thus,] individuals can
free themselves by filing UCC financing statements, thereby
acquiring an interest in their strawman. Thereafter, [pursuant to
this "theory,"] the real person can demand that government
officials pay enormous sums of money to use the strawman's name
or, in the case of prisoners, to keep him in custody.  If government
officials refuse, [adherents of this scheme] file liens against
[government officials] . Adherents of this scheme also advocate
that [they] copyright their names to justify filing liens against
officials using their names in public records such as indictments or
court papers.

Monroe v. Beard, 536 F.3d 198, 203 and nn. 3 and 4 (3d Cir. 2008);
accord Roche, 420 Fed. App'x 124, 2011 U.S. App. LEXIS 5773, at 2
(noting that the "sovereign citizen" litigant elected to present the district
court's dismissal of his petition as a "contract" between the court and the
litigant).

The "strawman" concept is, occasionally, presented/exploited somewhat
differently by those redemptionists who claim that - at the moment of their
denouncement of United States citizenship and/or their accompanying self-grant
of imaginary alternative citizenship - their "strawman" incarnation became
"deceased," and their live persons quasi-expatriated from the U.S. (while
continuing their actual physical residence in the United States).  In connection
with this odd quasi-expatriation scheme, such redemptionists often claim that
their live persons: (a) hold "estates" in the form of actual physical bodies of their

respective "quasi-deceased" strawmen;[3] and (b) reside in geographic locales "self-claimed away" from the United States.

[c].   Interplay Between Moorish and Sovereign Citizenship Movements

It does not appear that one's Moorish ethnic roots (or Moorish religious convictions, or both) have any reason to go hand-in-hand with one's adhesion to the sovereign citizenship movement (or with one's professing the theory of redemptionism, or with one's practice of "paper terrorism," claims of self- granted "diplomatic immunity," etc.).  However, and unfortunately enough, certain groups of individuals began merging these concepts by building on their alleged ancestry in ancient Moors (and/or on their alleged or actual adhesion to Moorish religious convictions) for the purposes of committing criminal offenses and/or initiating frivolous legal actions on the grounds of their self-granted "diplomatic immunity," which these individuals deduce either from their self-granted "Moorish citizenship" and from their correspondingly-produced homemade "Moorish" documents (or from correspondingly-obtained "world passports") or from a multitude of other, equally non-cognizable under the law, bases, which these individuals keep creating in order to support their allegations of "diplomatic immunity."[4]

_____

[3]  This "estate" concept is legally deficient on its face. As one court explained,

[such] "estates" of [litigants] cannot qualify as [actual] litigants since [these "estates"] offer no order by a probate court acknowledging the existence of these "estates" and, indeed, it would be surprising had such order been entered because it is well established that the body of a decedent cannot be an estate, or even a part of an estate.  See Greneker v. Sprouse, 263 S.C. 571, 574, 211 S.E.2d 879 (1975) (clarifying that the estate is limited to the real and personal property of a decedent); see also In re Estate of Medlen, 286 Ill. App. 3d 860, 864, 677 N.E.2d 33, 222 Ill. Dec. 220 (Ill. App. Ct. 1997) (explaining that "there is no property right in a dead body, and the body forms no part of the decedent's estate . . ." and citing 22A Am. Jur. 2d Dead Bodies §§ 2 and 3 and In re Estate of Fischer, 1 Ill. App. 2d 528, 535, 117 N.E.2d 855 (Ill. App. Ct. 1954)); In re Estate of Moyer, 577 P.2d 108, 110 (Utah 1978) (same); Snyder v. Holy Cross Hospital, 30 Md. App. 317, 352 A.2d 334 (Md. App. Ct. 1976) (same).

Estate of Casimir v. New Jersey, 2009 U.S. Dist. LEXIS 78113, at *9 (D.N.J. Aug. 31, 2009).

[4]  Such claims of "diplomatic immunity" are without merit. As it was already observed,

[Plaintiffs err in conflating their] expatriation and [diplomatic] immunity arguments, since: (a) Plaintiffs seem to focus on an irrelevant fact that anyone

Murakush-Amexem, 790 F. Supp. 2d 241, 2452-12 (footnotes in original).

2.      To the degree Plaintiff wishes to utilize this legal proceeding in order to express his socio-political beliefs, Plaintiff's submissions are facially frivolous. Socio-political rhetoric has no place in legal disputes, since this Court's Article III, § 2, cl. 1, mandate is limited to resolution of legal cases and controversies.

3.      However, taking notice of Plaintiff's prepayment of the applicable filing fee, the Court cannot rule out the possibility that Plaintiff has bona fide intent to litigate this matter, and Plaintiff's submissions made thus far were merely a result of Plaintiff's confusion caused by massive public dissemination of hoax "Moorish/Marrakush" forms, available online and even in hard copy, and often utilized by pro se litigants lacking legal savvy. See, e.g., Bey v. Stumpf, 2011 U.S. Dist. LEXIS 120076, at *28-36 (detailing the nature of this ill and providing examples of such hoax forms). Therefore, being mindful of Plaintiff's pro se litigant status and, hence, Plaintiff's susceptibility to confusion by such sources that might appear legitimate regardless of the hoax products these sources disseminate, this Court finds it warranted to allow Plaintiff an opportunity to litigate his legal claims in

---

may renounce his/her United States citizenship, but this fact in no way establishes that Plaintiffs actually expatriated in accordance with the applicable legal requirements, see, e.g., Memorandum Opinion for the Solicitor General of June 12, 2000, . . . ; Marks v. Esperdy, 315 F.2d 673 (2d Cir. 1963) . . . ; and (b) even if the Court were to hypothesize that Plaintiffs duly expatriated, the fact of expatriation has no effect on the state court's jurisdiction to conduct Plaintiffs' criminal proceedings. See, e.g., Cohen v. Little Six, Inc., 543 N.W.2d 376 (Minn. Ct. App. 1996); see also Cara S. O'Driscoll, The Execution of Foreign Nationals in Arizona, 32 Ariz. St. L.J. 323 (2000); [accord] Casanova v. Fitzpatrick, 214 F. Supp. 425 (S.D.N.Y. 1963) . . . .

Casimir, 2009 U.S. Dist. LEXIS 78113, at *19, n. 8 (parenthetical explanations omitted).

good faith, by submitting a valid amended complaint.  The Court stresses that Plaintiff's

amended complaint, if submitted, should be void of any "Moorish/Marrakush" argot or

legal claims.  In other words, Plaintiff shall utilize the form provided by the Clerk and

complete that form in *plain and simple English*.  The Court also takes this opportunity to

warn Plaintiff that his persistence at submitting documents executed in "Moorish" or

"Marrakush" style and/or argot would result in conclusive closure of this matter and

might even cause imposition of sanctions, if warranted.

> "The courts in this nation stand ready to address challenges brought by
> litigants, in turn, means that the judiciary —
> including the Judges in this District — expect litigants to treat their
> litigation with utmost seriousness, without abusing legal process and
> without unduly testing of the resolve or common sense of the judiciary."
> In re Telfair, 745 F. Supp. 2d 536, 2010 U.S. Dist. LEXIS 110681, at *130
> (D.N.J. Oct. 15, 2010).

> > Th[is] Court does not know why M.K., K.S., K.C., Bey, El, etc.
> > have chosen to file their labyrinthine, multi-defendant . . . actions
> > in federal courts over the years, or why they have elected to file the
> > Instant Matter, . . . in the last few weeks.  . . . [T]hese litigants
> > have . . . exacted and will continue to exact a heavy price on the
> > finite resources of this District Court and other federal courts at
> > district level and, hence, on litigants in other matters as to whom
> > justice will be delayed while those scarce [judicial] resources are
> > expended to process M.K., K.S., K.C., Bey and El's bounty.  See
> > Miller v. Donald, 541 F.3d 1091, 1096 (11th Cir. 2008)
> > ("Frivolous and vexatious law suits threaten the availability of a
> > well-functioning judiciary to all litigants"); Procup v. Strickland,
> > 792 F.2d 1069, 1072 (11th Cir. 1986) (en banc) ("Every lawsuit
> > filed, no matter how frivolous or repetitious, requires the
> > investment of court time, whether the complaint is reviewed
> > initially by a law clerk, a staff attorney, a magistrate, or the judge").
> > The undersigned will not sit idly by as this District Court is
> > inundated with harassing and vexatious litigation arising from
> > whatever M.K., K.S., K.C., Bey and El's perceived multimillion-
> > dollar constitutional affront du jour might be.

Bethel v. Bosch, 2010 U.S. Dist. LEXIS 128065, at *13 (S.D. Ala. Dec. 2, 2010).

Murakush Caliphate of Amexem Inc. v. New Jersey, 790 F. Supp. 2d 241, 267 (D.N.J. 2011) (original brackets and ellipses removed).

4.    Operating on presumption that Plaintiff might be interested in bona fide litigation, the Court finds it warranted to provide Plaintiff with guidance as to execution of Plaintiff's amended complaint.  The Court urges Plaintiff to study this guidance with utmost care and seriousness and execute his amended pleading, if any, in strict compliance with this guidance.

a.    A civil complaint must be *a clear and concise* statement.  In determining the sufficiency of a pro se complaint, the Court must be mindful to construe the facts stated in the complaint liberally in favor of the plaintiff.  See Haines v. Kerner, 404 U.S. 519 (1972); United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992). However, any civil complaint must conform to the requirements set forth in Rules 8(a) and (e) of the Federal Rules of Civil Procedure.  The Rules require that the complaint be simple, concise, direct and set forth "a *short and plain* statement of the claim showing that the pleader is entitled to relief."  Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993) (emphasis supplied); cf. McNeil v. United States, 508 U.S. 106, 113 (1993) (procedural rules in civil litigation should not be interpreted so as to excuse mistakes by those who proceed without counsel); Burks v. City of Philadelphia, 904 F. Supp. 421, 424 (E.D. Pa. 1995) (pleading which represented a "gross

departure from the letter and the spirit of Rule 8(a)(2)" in failing to contain a short and plain statement of claims struck by District Court); Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988) (affirming dismissal of pro se civil rights complaint naming numerous defendants, setting forth numerous causes of action, and numbering fifteen pages and eighty-eight paragraphs).  Here, the submissions made by Plaintiff are neither short nor plain: they show, if anything, that Plaintiff is not entitled to relief.  Therefore, these submissions should be, at the very least, dismissed without prejudice pursuant to Rule 8.  Correspondingly, in the event Plaintiff elects to execute his amended complaint, he should do it by stating his allegations in short and plain matter, without any resort to "Marrakush argot," citations to legal sources having no relevance to Plaintiff's factual predicate, pointless rhetoric, senselessly-picked Latin terms, irrelevant constitutional excerpts, etc.  Cf. Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990), for the observation that a pleading must indicate "the who, what, when, where, and how: the first paragraph of any newspaper story").  "A District courts should not have to read and decipher tomes disguised as pleadings."  Lindell v. Houser, 442 F.3d 1033, 1035 n.1 (7th Cir. 2006).

b.   Moreover, Rule 20(a)(2) of the Federal Rules of Civil Procedure limits the joinder of defendants, and Rule 18(a), governs the joinder of claims.  See Fed. R. Civ. P. 18(a), 20(a)(2).  Rule 20(a)(2) provides: "Persons . . . may be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally,

or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2)(A) and (B). Rule 18 (a) provides: "A party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party." Fed. R. Civ. P. 18(a). Wright & Miller's treatise on federal civil procedure explains that, where multiple defendants are named, the analysis under Rule 20 precedes that under Rule 18:

> Rule 20 deals solely with joinder of parties and becomes relevant only when there is more than one party on one or both sides of the action. It is not concerned with joinder of claims, which is governed by Rule 18. Therefore, in actions involving multiple defendants Rule 20 operates independently of Rule 18 . . . Despite the broad language of Rule 18(a), plaintiff may join multiple defendants in a single action only if plaintiff asserts at least one claim to relief against each of them that arises out of the same transaction or occurrence and presents questions of law or fact common to all . . .

Charles Allen Wright, Arthur R. Miller, Mary Kay Kane, <u>Federal Practice & Procedure Civil 3d</u> §1655; <u>see</u> <u>also</u> <u>United States v. Mississippi</u>, 380 U.S. 128, 143 (1965); <u>Ross v. Meagan</u>, 638 F. 2d 646, 650 n.5 (3d Cir. 1981), <u>overruled on other grounds by</u>, <u>Neitzke v. Williams,</u> 490 U.S. 319, 328 (1989) (joinder of defendants is not permitted by Rule 20 unless both commonality and same transaction requirements are satisfied). Consequently, a civil plaintiff may not name more than one defendant in his original or amended complaint unless one claim against each additional defendant is transactionally related to the claim

against the first defendant and involves a common question of law or fact.  <u>See</u>

Fed. R. Civ. P. 20(a)(2).  As the United States Court of Appeals for the Seventh

Circuit once explained, even a prisoner may not join in one case all defendants

against whom he may have a claim, unless the prisoner satisfies the dual

requirements of Rule 20(a)(2):

> Thus multiple claims against a single party are fine, but Claim A against Defendant 1 should not be joined with unrelated Claim B against Defendant 2. Unrelated claims against different defendants belong in different suits, not only to prevent the sort of morass that [a multi]-claim, [multi]-defendant suit produced but also to ensure that prisoners pay the required filing fees - for the Prison Litigation Reform Act limits to 3 the number of frivolous suits or appeals that any prisoner may file without prepayment of the required fees.  28 U.S.C. § 1915(g) . . .  A buckshot complaint that would be rejected if filed by a free person - say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions -should be rejected if filed by a prisoner.

<u>George v. Smith</u>, 507 F. 3d 605, 607 (7th Cir. 2007).

Here, Plaintiff's submissions hint at a panoply of transactions involving persons

who had no relation to other transactions: all these transactions and named

participants are merely "stitched" together by Plaintiff's overall assertion that his

rights were, somehow, violated and/or that he found some transactions not to his

liking.  <u>See</u>, <u>generally</u>, Docket Entries Nos. 1 and 2.  Since the Federal Rules of

Civil Procedure do not allow such "stitching," Plaintiff's submissions are also

subject to dismissal for failure to meet the requirements of Rules 18 and 20, and

his amended complaint, if filed, should be executed in accordance with the

requirements of Rules 18 and 20.

c.      In addition to foregoing, a civil complaint, even that submitted by a <u>pro se</u> litigant, must meet the pleading requirements by stating sufficient factual heft.  It had long been established that, while a court should "accept as true all of the [factual] allegations in the  complaint and reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff," <u>Morse v. Lower Merion School Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997), the courts do not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations.  <u>See id.</u> Addressing the clarifications as to the litigant's pleading requirement stated in the United States Supreme Court in <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007), the Court of Appeals for the Third Circuit provided the courts in this Circuit with detailed and careful guidance as to what kind of allegations qualify as pleadings sufficient to pass muster under the Rule 8 standard.  <u>See</u> <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 230-34 (3d Cir. 2008).  Specifically, the Court of Appeals observed as follows:

> "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation [is] to provide the 'grounds' of his 'entitle[ment] to relief' [by stating] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . ." <u>Twombly</u>, 127 S. Ct. at 1964-65  . . .  Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." <u>Id.</u> at 1965 n.3.  . . .  "[T]he threshold requirement of Rule 8(a)(2) [is] that the 'plain statement [must] possess enough heft to 'sho[w] that the pleader is entitled to relief.'" <u>Id.</u> at 1966.  [Hence] "factual allegations must be enough to raise a right to relief above the speculative level." <u>Id.</u> at 1965 & n.3. . . . [Indeed, it is not] sufficient to allege mere elements of

> a cause of action; instead "a complaint must allege facts
> suggestive of the proscribed conduct."  Id.

Id. at 230-34 (original brackets removed).

This pleading standard was further refined by the United States Supreme Court in

Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), where the Court observed:

> [In any civil action, t]he pleading standard . . . demands more than
> an unadorned ["]the-defendant- unlawfully-harmed-me["]
> accusation. [Twombly, 550 U.S.] at 555 . . . .  A pleading that
> offers "labels and conclusions" or "a formulaic recitation of the
> elements of a cause of action will not do." [Id.] at 555.  Nor does a
> complaint suffice if it tenders "naked assertion[s]" devoid of
> "further factual enhancement."  Id. at 557.  . . .  A claim has facial
> plausibility [only] when the plaintiff pleads factual content . . . .
> Id. at 556.  [Moreover,] the plausibility standard . . . asks for more
> than a sheer possibility that a defendant has acted unlawfully.  Id.
> [Indeed, even w]here a complaint pleads facts that are "merely
> consistent with" a defendant's liability, [the so-alleging complaint
> still] "stops short of [showing] plausibility of 'entitlement to
> relief.'"  Id. at 557 (brackets omitted).  [A fortiori,] the tenet that a
> court must accept as true all of the allegations contained in a
> complaint is inapplicable to legal conclusions [or to t]hreadbare
> recitals of the elements of a cause of action, supported by mere
> conclusory statements [,i.e., by] legal conclusion[s] couched as a
> factual allegation [e.g.,] the plaintiffs' assertion of an unlawful
> agreement [or] that [defendants] adopted a policy "'because of,'
> not merely 'in spite of,' its adverse effects upon an identifiable
> group."  . . .  [W]e do not reject these bald allegations on the
> ground that they are unrealistic or nonsensical. . . .  It is the
> conclusory nature of [these] allegations, rather than their
> extravagantly fanciful nature, that disentitles them to the
> presumption of truth. . . . [Finally,] the question [of sufficiency of]
> pleadings does not turn . . . the discovery process.  Twombly, 550
> U.S.] at 559 . . . . [The plaintiff] is not entitled to discovery
> [where the complaint alleges any of the elements] "generally,"
> [,i.e., as] a conclusory allegation [since] Rule 8 does not [allow]
> pleading the bare elements of [the] cause of action [and] affix[ing]
> the label "general allegation" [in hope to develop facts through
> discovery].

<u>Iqbal</u>, 129 S. Ct. at 1949-54.

Here, Plaintiff's submissions are heavily laden with bold conclusions but contained just a handful of facts, thinly peppered over plentitude of self-serving conclusory statements.   Therefore, Plaintiff's submissions are also subject to dismissal for failure to meet the pleading requirements, as detailed in <u>Iqbal</u> and <u>Twombly</u>, and Plaintiff's amended complaint, if filed, should be executed in a thoughtful and careful manner, in compliance with these pleading requirements.

5. Finally, to the degree the Court can distill the substance of Plaintiff's claims from the submissions at bar, the Court will screen these submissions on merit, weeding out the allegations that facially fail to state a cognizable claim: notwithstanding the payment of a filing fee, the Court is obligated to screen Plaintiff's submissions pursuant to 28 U.S.C. § 1915A.  <u>See</u> <u>Vega v. Kyler</u>, 90 F. App'x 437 (3d Cir. Pa. 2004) (where the litigant pays filing fee, his civil rights complaint is subject to <u>sua</u> <u>sponte</u> review on merits under 28 U.S.C. § 1915A(b)); <u>Vieux v. Smith</u>, 2007 U.S. Dist. LEXIS 40859 (M.D. Pa. 2007); <u>Padilla v. Beard</u>, 2006 U.S. Dist. LEXIS 98622 (M.D. Pa. 2006).  Here, Plaintiff, seemingly, named four Defendants: (a) William Gasborro ("Gasborro"), a Municipal Court Judge who presided over Plaintiff's criminal state proceedings; (b) Carie A. Crone ("Crone"), the Clerk of a Municipal Court; (c) James P. Grimley, Esq. ("Grimley"), an attorney handling DWI/DUI, minor drug offenses and analogous matters for the Municipal Court, acting as the prosecutor; (d) Officer C. Cavileer ("Cavileer"); and (e) unspecified "Colorable Officers" ("Officers").  <u>See</u> Docket Entry No. 1 at 2.  The best the Court can surmise after carefully studying the patchy submissions at bar, Plaintiff was

prosecuted in Absecon Municipal Court for a certain minor penal offence, having
Gasborro presiding over this criminal proceeding, Grimley representing the State during
the same, Cavileer being present in the courtroom during certain points of this
prosecution, and Crone processing and docketing the documents produced in connection
with this prosecution.  See, generally, Docket Entry No. 1.  Plaintiff's allegations against
Gasborro appear limited to: (a) Plaintiff's belief that Gasborro (and/or the Municipal
Cour) lacked jurisdiction to prosecute Plaintiff; (b) Plaintiff's disagreement with how
Gasborro construed Plaintiff's submissions filed in that criminal matter and, seemingly,
executed in the Marrakush/Moorish style/argot; (c) Plaintiff's opinion that Gasborro's
evidential rulings were erroneous; (d) Plaintiff's dislike of the judgment entered by
Gasborro; and (e) Plaintiff's speculations that Gasborro was unqualified to act as
Plaintiff's tribunal.  See id.  Plaintiff's allegations against Grimley appear limited to: (a)
Plaintiff's opinion that certain motions made by Grimley on behalf of the State were
meritless; (b) Plaintiff's belief that Grimley erred in his positions as to the merits of
State's case against Plaintiff and as to the nature of Plaintiff's motion executed in the
Marrakush/Moorish style/argot; and (c) Plaintiff's impression that Grimley's
representation of the State's interests was procedurally deficient.  See id.  Plaintiff's
allegations against Cavileer are limited to the statement that, during a certain point of
Plaintiff's criminal prosecution, Cavileer was physically standing between Plaintiff and
Plaintiff's defense counsel, thus blocking Plaintiff's view of his counsel.  See id. at 7.
This Court was unable to locate *any* factual statements in the submissions at bar
implicating Crone or the "Offices" in any wrongs or any actions.  See, generally, id.

a.     To the degree Plaintiff intended to challenge Municipal Court's jurisdiction over his criminal prosecution and/or the propriety of Gasborro's designation as the tribunal presiding over Plaintiff's criminal proceedings, Plaintiff's claims are facially meritless.  Regardless of Plaintiff's emotions, state courts of every level, including municipal courts, have proper jurisdiction to conduct civil and criminal proceedings.

> [I]t is well-recognized . . . that such organizations as the Moorish American Nation and [similar imaginary creations, like] the Nation of Washitaw, are[] notorious organization[s] of scofflaws and ne'er-do-wells who attempt to benefit from the protections of federal and state law while simultaneously proclaiming their independence from and total lack of responsibility under those same laws.  Sanders-Bey v. United States, 267 F. App'x 464, 466 (7th Cir.2008) (finding that "the Washitaw Nation . . . is not recognized by the United States government"); Bybee v. City of Paducah, 46 F. App'x 735, 736-37 (6th Cir.2002) (finding that the "Nation of Washitaw" is "fictional"); United States v. Gunwall, 1998 U.S.App. LEXIS 18596, at *11 (10th Cir. Aug. 12, 1998) (rejecting claim that the court had no jurisdiction over a member of the Washitaw as "frivolous") . . . .

El-Bey v. United States, 2009 U.S. Dist. LEXIS 33838 (M.D.N.C. Jan. 26, 2009); accord Tzdiquah Bah't Yisra-El v. City of Ferguson Mun. Court, 2011 U.S. Dist. LEXIS 55705 (E.D. Mo. May 24, 2011) (plaintiff's allegations that the state court lacked jurisdiction over him were frivolous); Carter El v. Keller, 2011 U.S. Dist. LEXIS 44966 (M.D.N.C. Apr. 26, 2011) (same); Jackson-El v. State & Fed. Plaintiffs in Gen., 2011 U.S. Dist. LEXIS 45332 (W.D. Mich. Apr. 26, 2011) (same); Tirado v. New Jersey, 2011 U.S. Dist. LEXIS 32337 (D.N.J. Mar. 28, 2011) (same); Burpee-El v. Warden, Fort Dix, 2010 U.S. Dist. LEXIS 118307

(D.N.J. Nov. 8, 2010) (same); <u>Bank of Am. Nat'l Ass'n v. Derisme</u>, 2010 U.S.

Dist. LEXIS 82361 (D. Conn. Aug. 13, 2010) (same); <u>Cohen v. Little Six, Inc.</u>,

543 N.W.2d 376 (Minn. Ct. App. 1996) (same).  Analogously, to the extent

Plaintiff seeks this Court's review of the outcome of his Municipal Court

proceedings or of Gasborro's competency to preside over Plaintiff's criminal

prosecution, this Court is wholly without a mandate to conduct such review.  The

"proper procedure dictates review through the state appellate process, not the

federal system."  <u>Ephraim v. Asbury Park Mun. Court</u>, 2011 U.S. Dist. LEXIS

58020, at *3-4 (D.N.J. May 31, 2011) (relying on <u>E.B. v. Verniero</u>, 119 F.3d

1077, 1090 (3d Cir. 1997).[5]

b.      To the degree Plaintiff intended to assert that Gasborro's actions, in Gasborro's

capacity as a Municipal Judge, violated Plaintiff's rights, Plaintiff's challenges are

barred by absolute judicial immunity.  The doctrine of judicial immunity provides

that "judges are immune from suit under section 1983 for monetary damages

arising from their judicial acts."  <u>Gallas v. Supreme Court of Pa.</u>, 211 F.3d 760,

768 (3d Cir. 2000); <u>see</u> <u>also</u> <u>Mireles v. Waco</u>, 502 U.S. 9 (1991) (<u>per</u> <u>curiam</u>).  To

---

[5]

First, the Third Circuit has held that a federal district court may not exercise
jurisdiction over a municipal court proceeding such as the instant case involving a
traffic citation.  <u>See</u> <u>Janciga v. Vora</u>, 257 F. App'x 530, 530-531 (3d Cir. 2007)
(dismissing appeal for a claim concerning a traffic citation); <u>see</u> <u>also</u> <u>Pa. v. Vora</u>,
204 F. App'x 134, 136 (3d Cir. 2006) (holding that a federal district court does
not have jurisdiction over a state traffic court matter).

<u>Ephraim</u>, 2011 U.S. Dist. LEXIS 58020, at *4.

determine whether the judicial immunity doctrine applies, the Court must establish: (a) whether the judge's actions were "judicial" in nature; and (b) whether the judge acted in the "clear absence of all jurisdiction over the subject matter." Gallas, 211 F.3d at 768-69 (quoting Stump v. Sparkman, 435 U.S. 349, 356 n.6 (1978)). An act is judicial in nature if "it is a function normally performed by a judge" and if the parties "dealt with the judge in his judicial capacity." Stump, 435 U.S. at 362. Here, Plaintiff's allegations, while exceedingly patchy and heavily laden with self-serving bold conclusions, establish with complete certainty that Plaintiff challenges Gasborro's rulings entered in Gasborro's judicial capacity during the process when Gasborro was treated as the presiding tribunal. Plaintiff's displeasure or disagreements with Gasborro's rulings are of no import. "[A litigant's] allegations of bad faith [and] malice" cannot overcome [judicial] immunity." Abulkhair v. Rosenberg, 2012 U.S. App. LEXIS 494 (3d Cir. Jan. 10, 2012) (quoting Mireles, 502 U.S. at 11). Simply put, "an act does not become less judicial by virtue of an allegation of malice or corruption of motive," or that such action is "unfair" or "controversial." Gallas, 211 F.3d at 769; accord Stump, 435 U.S. at 363 ("[d]isagreement with the action taken by the judge . . . does not justify depriving the judge of his immunity"). Therefore, Plaintiff's claims against Gasborro will be dismissed with prejudice and such claims should *not* be raised in Plaintiff's amended complaint, if filed.

b.    Plaintiff's claims against Grimley are analogously deficient on their face, being barred by prosecutorial immunity. "[A] state prosecuting attorney who act[s]

within the scope of his duties in initiating and pursuing a criminal prosecution" is

not amenable to suit under § 1983.  See Imbler v. Pachtman, 424 U.S. 409, 410

(1976); accord Morton v. United States Attorney's Office, 208 Fed. App'x 1 (D.C.

Cir. 2006) (applying prosecutorial immunity to federal prosecutors).  Thus, a

prosecutor's appearance in court as an advocate of the state government and

prosecutorial decisions as to presentation of evidence during such appearances are

protected by absolute immunity.  See Burns v. Reed, 500 U.S. 478, 492 (1991).

Similarly, all other "acts undertaken by a prosecutor in preparing for the initiation

of judicial proceedings or for trial, and which occur in the course of his role as an

advocate for the State, are entitled to the protections of absolute immunity."  See

Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993).[6]  Since Plaintiff's

submissions, while hard to decipher and heavily infused with irrelevant rhetoric,

unambiguously indicate that Plaintiff's challenges to Grimpley's actions are

limited to Plaintiff's displeasure with Grimley's actions as a prosecutor, i.e.,

strategic choices, procedural choices, statements of substantive legal conclusions,

etc., Plaintiff's allegations are facially barred by prosecutorial immunity.

Therefore, Plaintiff's claims against Grimley will be dismissed with prejudice and

these claims should *not* be raised in Plaintiff's amended complaint, if filed.

---

[6] A prosecutor is not entitled to absolute immunity for actions undertaken in some *other* function.  See Kalina v. Fletcher, 522 U.S. 118 (1997); Burns, 500 U.S. at 492-96; Buckley, 409 U.S. at 276-78; see also Yarris v. County of Delaware, 465 F.3d 129 (3d Cir. 2006).  Here, Plaintiff's submissions indicate, with certainty, that Plaintiff challenges only Grimley's decisions made as an advocate of the State, i.e., Grimley's suppression motions, Grimley's procedural applications, Grimley's arguments as to substantive law, Grimley's expressions of opinion as to the proper qualification of Plaintiff's submissions made in Moorish/Marrakush argot, ect.

c.     Plaintiff's allegations against Cavileer are puzzling, being limited to the sole statement that, at one point during Plaintiff's criminal prosecution, Cavileer was physically standing between Plaintiff and his defense counsel, and either Cavileer or Plaintiff, or the defense counsel had to move in order for Plaintiff to see his defense counsel (or vice-versa).  <u>See</u> Docket Entry No. 1, at 7.  As stated, these allegations fail to allege any cognizable constitutional wrong, or a legal wrong of any kind.  However, granted both the brevity and oddity of this challenge, the Court finds it warranted, out of abundance of caution, to dismiss this claim without prejudice, allowing Plaintiff an opportunity to state, clearly and concisely, Plaintiff's challenges against Cavileer.  The Court stresses that, pursuant to Rule 8 and <u>Iqbal</u>, Plaintiff's statements should be simple and limited to factual points, free of self-serving bold conclusions, Moorish/Marrakush argot, irrelevant discussions of law (be it as it is perceived by Plaintiff or as Plaintiff desires the law to be, etc.)

d.     Plaintiff's challenges against Crone and Officers will analogously be dismissed without prejudice since Plaintiff's submissions appear wholly silent as to any Crone and/or Officers' actions.  <u>See</u>, <u>generally</u>, Docket Entry No. 1.  Therefore, as with Cavileer, Plaintiff will be allowed an opportunity to elaborate on the *facts* underlying his challenges, if any, against Crone and the Officers, provided that Plaintiff's amended pleading states these challenges in a simple and concise fashion required by Rule 8 and <u>Iqbal</u>, and in accordance with the requirements

posed by Rules 18 and 20, that is, in the event these claims are joined to each other or to those against Cavileer.

IT IS, THEREFORE, on this    24th    day of    May    , 2012,

ORDERED that Plaintiff's submissions at bar, Docket Entries Nos. 1 and 2, are dismissed; and it is further

ORDERED that Plaintiff's challenges against Defendants Gasborro and Grimley are dismissed *with prejudice*, and the Clerk shall terminate these persons as Defendants in this matter; and it is further

ORDERED that Plaintiff's challenges against Defendants Crone, Cavileer and "Colorable Officers" are dismissed *without prejudice*; and it is further

ORDERED that the Clerk shall administratively terminate this action by making a new and separate entry on the docket reading, "CIVIL CASE TERMINATED"; and it is further

ORDERED that no statement made in this Memorandum Opinion and Order shall be construed as withdrawal of the Court's jurisdiction over this action, and administrative termination shall not be deemed a conclusive dismissal of the entirety of this matter; and it is further

ORDERED that Plaintiff may have this matter reopened in the event Plaintiff submits, within thirty days from the date of entry of this Memorandum Opinion and Order, Plaintiff's amended complaint stating, in a clear and concise fashion and without any Moorish/Marrakush argot, irrelevant rhetoric or discussion of law, *solely the facts* of Plaintiff's challenges against Defendants Crone, Cavileer and "Colorable Officers."  Such amended pleading shall be executed in strict compliance with the requirements of Rules 8, 18 and 20.  The Court stresses that

Plaintiff's submission of another untidy pleading would be deemed mockery of the Court and would result in a conclusive dismissal of this matter, and – if appropriate – the Court might consider sanctioning Plaintiff for submitting such amended pleading; and it is further

ORDERED that, in the event Plaintiff timely submits a properly executed amended complaint, the Court will direct the Clerk to reopen this matter and will screen Plaintiff's amended complaint on merits; and it is finally

ORDERED that the Clerk shall serve this Memorandum Opinion and Order upon Plaintiff by regular U.S. mail, and include in the said mailing a blank civil complaint form.

s/Robert B. Kugler
**Robert B. Kugler**
**United States District Judge**